IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | **CIVIL ACTION NO. 06-30051-01** |
| **VERSUS** | \* | **JUDGE JAMES** |
| **REBA DALE MOODY** | \* | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress filed by the defendant, Reba Dale Moody ("Moody") (Document No. 12). For reasons stated below, it is recommended that the motion be **DENIED.**

## BACKGROUND

The evidence presented at a hearing held on Thursday, April 19, 2007, demonstrated as follows. Lieutenant Mike Rowland ("Rowland") of the Ouachita Parish Sheriff's Department testified that, on August 28, 2006, pursuant to an ongoing investigation of Moody, he proceeded to a house located at 209 Minnifield Road in Calhoun, Louisiana.[1] When he arrived at the house, along with approximately six or seven other officers and Sergeant Connie Miller ("Miller") of the Ouachita Parish Sheriff's Office Warrant Division, Rowland knocked on the door and Moody answered a few seconds later. Both Rowland and Miller testified that the knock was a normal one, not a loud or threatening one. Miller was standing with Rowland when he knocked, the other officers were in various locations on the property. Neither Miller nor Rowland had their weapons drawn, and neither remembered any of the other officers with weapons drawn either.

When Moody answered the door, Rowland told Moody who he was and asked her to

---

[1] Rowland testified that Moody is not the owner of the house where the encounter took place.

identify herself. He told her that he was conducting a investigation and that he wanted to speak with her. Rowland testified that he asked for Moody's full name and date of birth, which Moody provided. Rowland advised Moody of her *Miranda* rights. After obtaining Moody's name and date of birth, Miller called in the information and determined that Moody had outstanding warrants for her arrest in Mississippi.

At that point, Rowland asked Moody if he could search her van that was parked in front of the house.[2] According to both Rowland and Miller, Moody readily granted Rowland permission to search the van. Miller testified that she was standing right next to Rowland and Moody when Rowland asked for consent, and that she heard him ask for consent and heard Moody grant it. Rowland testified that he did not inform Moody of her right to refuse consent nor did he obtain written consent.

The search resulted in the discovery of 72 grams of methamphetamine, assorted papers bearing Moody's name, and a set of scales commonly used in drug trafficking. Rowland testified that neither he nor Miller had their guns drawn at any time during the encounter with Moody and that no one threatened Moody in any way in order to obtain her consent to search the van. Rowland and Miller both testified that Moody was cooperative during the encounter; that she was alert and appeared to understand what they were saying and what was taking place; that she did not appear to be under the influence of any drugs or alcohol; that she stood with Sergeant

---

[2] Rowland testified that an informant had told him that Moody purchased a white van the day prior to the encounter at issue. Rowland stated that, after Moody was transported to Metro Narcotics headquarters, she stated first that the van was hers, but she later recanted and claimed that she had bought the van for her mother. However, according to Rowland, Moody stated nothing to this effect at the scene of the search. Moody adduced no evidence contradicting Rowland's testimony nor has she adduced any evidence supporting the notion that she was not the owner of the van.

2

Miller while the van was searched, and that she never told the officers to stop searching the van.

Rowland testified that he had no knowledge of Moody's education or intelligence level at the time of the encounter, but he stated that he had no reason to believe that she was not able to understand what was happening. He did admit that, although he never informed Moody that she was under arrest and although she was not handcuffed when he sought consent or during the search of the van, Moody was not free to leave from the point that it was determined that she had an outstanding warrant. Miller also testified that Moody was not handcuffed or restrained in any way from the time the officers arrived to the completion of the search of the van, but confirmed that she was not free to leave.

## LAW AND ANALYSIS

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well settled that . . . a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject to only a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Katz v. U.S.*, 389 U.S. 347, 357 (1967)). In this case, it is uncontested that the officers did not obtain a warrant to search the van and that there were no exigent circumstances that would have justified a warrantless search. Rather, the Government contends that Moody consented to the search of the van and therefore that no warrant was needed. "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* (citing *Davis v. U.S.*, 328 U.S. 582, 593-94 (1946); *Zap v. U.S.*, 328 U.S. 624, 630 (1946)). Accordingly, the only issue to be decided is

whether Moody did in fact consent to the search and, if so, whether such consent was valid.

The government typically has the burden of proving voluntary consent by a preponderance of the evidence. *Shabazz*, 993 F.2d at 438 (citing *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir.1991). However, ". . . the government's burden to prove consent by [a] preponderance of the evidence is not as heavy as it would have been had a Fourth Amendment violation preceded the consent." *United States v. Estrada*, 459 F.3d 627, 633 (5th Cir. 2006) (citing *United States v. Dortch*, 199 F.3d 193, 201 (5th Cir. 1999)). There is no allegation in this case of a Fourth Amendment violation prior to the time Rowland sought consent to search the van.[3]

The uncontradicted testimony in this case is that Moody did in fact consent to the search. Rowland testified that, after learning that there were outstanding warrants for Moody's arrest, he asked Moody for permission to search the van, which Moody provided. Rowland's testimony was corroborated by Miller, who testified that she was present when Rowland asked Moody for permission to search the van and that she heard Moody grant such permission. Rowland testified that he did not obtain written consent from Moody; however, this Court is aware of no authority supporting the notion that consent to search must be in writing. Accordingly, the undersigned finds that Moody consented to the search of the van.

Such finding, however, does not end the inquiry in this matter. "'To be valid, consent to search must be free and voluntary.'" *Shabazz*, 993 F.2d at 438 (quoting *United States v. Kelley*,

---

[3]Although it is somewhat unclear, there was testimony by Miller indicating that Officer Rowland or perhaps one or two other officers entered the house when they first arrived and prior to seeking Moody's consent to search the van. However, there is no indication that the officers conducted a search during this time. Furthermore, whether a search of the home took place has no bearing on the legality of the search of Moody's van because it is undisputed that Moody was not the owner of the home.

4

981 F.2d 1464, 1470 (5th Cir. 1993). "The voluntariness of consent is a question of fact to be determined on the totality of the circumstances." *Id.* In order to make this determination, courts look to the following factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police tactics; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of her right to refuse consent; (5) her education level and intelligence; and (6) her belief that no incriminating evidence will be found. *Id.* Although all six factors are relevant, no single factor is dispositive. *Id.*

In this case, the first factor weighs against the government. Although Rowland testified that Moody was never told that she was under arrest nor was she handcuffed at the time she consented to the search of the van, she was in the presence of anywhere from six to eight law enforcement officers and she had been read her *Miranda* rights. Given these facts, it is not likely that Moody felt that she was free to leave at any point during the encounter.

As to the second factor, both Rowland and Miller testified that the knock was not abnormally loud or threatening, that neither of them had their guns drawn at any time during the encounter, and that at no time during the incident was Moody threatened with any adverse consequences if she did not consent to the search. Rowland and Miller also testified that Moody was not handcuffed or restrained in any way at the time consent to search was sought or during the time the search was being conducted  As no evidence was submitted contradicting this testimony, there is no evidence of any unduly coercive tactics on the part of Rowland or any other officer at the scene.

Regarding the remaining factors, both Rowland and Miller testified that Moody was very cooperative throughout the incident. Roland testified that he did not specifically inform Moody of her right to refuse consent, but it is undisputed that he did give Moody Miranda warnings and

that he did in fact ask for permission to search, which the defendant gave without hesitation. No specific evidence was presented by either side regarding Moody's educational level and intelligence; however, both Rowland and Miller testified that Moody seemed alert and lucid, and that she appeared to understand what the officers were saying and what was taking place. Finally, there was no evidence presented regarding whether Moody believed that any incriminating evidence would be found in the van; however, the contraband, while hidden, was not particularly well hidden.

Having considered the above factors, the undersigned finds that, under the totality of the circumstances, Moody's consent was voluntarily given. In light of this finding, and the fact that Moody's arrest was justified by the aforementioned outstanding warrants, Moody's Fourth Amendment rights were not violated. Thus, her motion to suppress the evidence seized from the van should be **DENIED**.

## CONCLUSION

For the reasons stated above, it is recommended that defendant's Motion to Suppress be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS**

**REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 20th day of April, 2007.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE